UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

ERIEK Z. NICKSON,                      )
             Plaintiff,            )
                           )
     v.                               )     CAUSE NO.: 2:19-CV-492-JVB-JPK
                           )
UNITED STATES STEEL CORPORATION,       )
             Defendant.            )

## OPINION AND ORDER

This matter is before the Court on Defendant, United States Steel Corporation's, Motion for Summary Judgment [DE 33] filed on December 3, 2021, Plaintiff's Motion to Strike Portions of Defendant's Summary Judgment Evidence [DE 38] filed on December 31, 2021, and Defendant United States Steel Corporation's Motion to Strike Evidence Submitted by Plaintiff in Response to U.S. Steel's Motion for Summary Judgment [DE 41] filed on January 14, 2022. All three motions are fully briefed and ready for ruling.

Plaintiff Eriek Z. Nickson initiated this cause of action by filing a complaint on December 23, 2019. In that complaint, Plaintiff alleges that he, a Black male and former employee of Defendant United States Steel Corporation, was subjected to employment discrimination by Defendant based on his race and retaliation in violation of 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981.

### NICKSON'S MOTION TO STRIKE

Nickson asks the Court to strike portions of the McElfresh affidavit and Solomon affidavit on the basis that they are not based on personal knowledge, are inadmissible hearsay, and are not relevant. The Court addresses Nickson's objections below.

*McElfresh Affidavit*

Regarding paragraphs 6-7, there are no hearsay statements. McElfresh is making averments regarding his own knowledge and ability to access certain U.S. Steel documents. The Court will not strike these paragraphs.

Paragraph 9, sentence 3 of the affidavit is "Downs has uniformly issued discipline to employees and enforced LCA provisions, regardless of an employee's race." Nickson objects that McElfresh has no personal knowledge of Downs's motivation for employment decisions, but this sentence does not address Downs's motivation, only the external observation that the discipline was issued uniformly regardless of race. Regarding the hearsay objection, there is no hearsay statement. The Court will not strike this sentence.

Nickson contends that paragraphs 12-13 are irrelevant, but U.S. Steel counters that the prior discipline that was recounted in those paragraphs is relevant to the question of how safety violations are handled. The Court finds that there is relevance and will not strike these paragraphs.

Nickson argues that McElfresh lacks the personal knowledge to attest to the matters in paragraph 14 other than the race of Novak and Nickson.  Personal knowledge is "grounded in observation or other first-hand personal experience." *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). Opinions with such a grounding are permitted; "flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience" are not. *Id.* The paragraph in question (with its accompanying footnote), is as follows:

> I am also aware that a physical altercation between Matt Novak [Novak], who is white, and Nickson, who is black, took place on October 31, 2018. Neither Novak nor Nickson reported the incident to Management immediately after it occurred. Instead, Management learned of the altercation after Novak changed his version of how he was hurt[2] on October 31, 2018. Specifically on November 29, 2018, Novak told his supervisor, Marc Shewmaker [Shewmaker], that he [Novak] had actually hurt his leg during a physical fight with Nickson. Prior to this date, Novak had told

U.S. Steel Management that he had injured his leg while bending over to pick up piece of angle iron

[2] Novak's injury was so severe that he required ankle reconstruction surgery on November 19, 2018.

McElfresh attested that he has access to the discipline history of all U.S. Steel employees at the Gary Works facility and that he is familiar with the issues in this lawsuit and Nickson's discipline, grievance, and termination history. McElfresh also has personal knowledge of U.S. Steel's workplace violence policy. Through McElfresh's position at U.S. Steel, he has personal knowledge of Nickson's and Novak's reports to U.S. Steel regarding the altercation. This knowledge encompasses the inference that the altercation itself occurred. Because McElfresh had personal knowledge, the Court will not strike the body of paragraph 14. However, the Court finds that it has not been established that McElfresh had personal knowledge of the extent of Novak's injury, so the Court strikes footnote 2.

McElfresh's position, access, and knowledge as discussed in the previous paragraph also provide the foundation to show personal knowledge for the matters testified to in paragraphs 15-19, so the Court will not strike these paragraphs. Though Nickson takes issue with paragraph 19 on the additional ground that U.S. Steel did not disclose any records responsive on the matter, nothing in the paragraph reveals that there were any undisclosed written records subject to discovery, so the Court will not strike paragraph 19 on this basis.

McElfresh likewise has testified based on personal knowledge regarding the remaining challenged paragraphs. Paragraphs 25, 26, and 28 concern Nickson's disciplinary history. Paragraph 29 concerns the decision to terminate Nickson's employment. As final approval rested with McElfresh, he had the requisite personal knowledge to testify whether Nickson's race was considered or factored in the decisions to discipline Nickson. Paragraphs 30-33, 38, and 39 consider disciplinary and Last Chance Agreement (LCA) matters regarding other employees that

3

are within McElfresh's personal knowledge due to his role at U.S. Steel. Paragraphs 34 and 35 pertain to the EEOC charges that Nickson filed. Paragraph 37 concerns whether Labor Relations had any record of a Civil Rights Complaint filed by Nickson. McElfresh is Manager of Labor Relations and is responsible for investigating claims of discrimination that it receives. McElfresh is able to testify regarding whether his department had record of such a claim. The Court will not strike any of these paragraphs.

### *Solomon Affidavit (DE 36-8)*

Nickson argues that paragraph 4 should be stricken as irrelevant because it is not related to either of Nickson's discharges. U.S. Steel counters that the paragraph is relevant because it is evidence of how U.S. Steel handles disciplinary matters. The Court finds that this paragraph is relevant and will not strike it.

Regarding paragraph 5, sentence 3, U.S. Steel states that this is moot because this sentence was not used in the summary judgment briefing. Because no party relies on this statement, it can be stricken from the record with no effect on the motion for summary judgment. The Court grants the motion to strike as to this sentence.

Based on the above, the Court will grant in part and deny in part Nickson's motion to strike.

### **U.S. STEEL'S MOTION TO STRIKE**

U.S. Steel asks the Court to strike portions of Nickson's declaration and Exhibits J (in part), K, Q, R, S, and T because they contain inadmissible evidence.

### *Exhibits*

U.S. Steel argues that Exhibit J is hearsay as to statements made by a Daniel Savka. Nickson argues that Exhibit J is a business record, but that has not been established. "Evidence offered at summary judgment must be admissible to the same extent as at trial, at least if the

opposing party objects, except that testimony can be presented in the form of affidavits or transcripts of sworn testimony rather than in person." *Baines v. Walgreen Co.*, 863 F.3d 656, 662 (7th Cir. 2017). "Documents must be authenticated by an affidavit that lays a proper foundation for their admissibility, even at the summary judgment stage." *Steffek v. Client Servs., Inc.*, 948 F.3d 761, 769 (7th Cir. 2020). Nickson has not shown that this document is a business record by qualifying testimony or certification. *See* Fed. R. Evid. 803(6)(D). Further, Mr. Savka's statements are out of court statements that Nickson attempts to use for the truth of the matter asserted. They are hearsay and are therefore stricken.

U.S. Steel and Nickson agree that Exhibit K is only to be used to show that Downs was sent the letter and not for the truth of the matter asserted in the letter. Because it is not used for the truth of the matter asserted, this is not hearsay, and the Court will not strike the exhibit.

U.S. Steel asserts that Exhibits Q, R, S, and T are hearsay. Exhibits Q and R are both titled "Minutes of Second Step Meeting with Grievance Committee." Exhibits S and T are both titled "Exceptions to Second Step Minutes" and signed by Robert Popplewell, Chairman of the United Steelworkers of America Local Union 1066 Grievance Committee. Nickson asserts that these documents, which were provided by U.S. Steel to Nickson in discovery, are admissible as business records pursuant to Federal Rule of Evidence 803(6). Nickson has not shown that these documents are business records by qualifying testimony or certification, so the Court strikes them. However, the Court notes that U.S. Steel has submitted the December 27, 2018 Minutes of Second Step Meeting with Grievance Committee, which Nickson submitted as Exhibit Q, into the record as Exhibit 3 to the deposition of Downs, and no one is asking to strike this copy of the minutes, which remains in the record.

*Nickson's Declaration*

U.S. Steel asks the Court to strike paragraph 2.a from Nickson's declaration on the basis that it is irrelevant, contains hearsay, and is impermissible character evidence.

The Court agrees with Nickson that nothing is asserted in the question asked in paragraph 2.a and that it is not hearsay. Further, since Nickson brings a § 1981 claim regarding his 2018 termination, the paragraph has some relevance. The Court turns to the question's answer, given by Marc Shewmaker.

A statement is not hearsay if "[t]he statement is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). "[N]ot everything that relates to ones' job falls within the scope of one's agency or employment." *Stephens v. Erickson*, 569 F.3d 779, 793 (7th Cir. 2009) (quoting *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 950 (7th Cir.1998)). Still, "[t]he only requirement is that the subject matter of the admission match the subject matter of the employee's job description." *Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 762 (7th Cir. 2003).

The evidence establishes that Marc Shewmaker, who was employed as Transportation Department Manager, was Nickson's immediate supervisor. (Solomon Aff. ¶ 3, ECF No. 36-8). The Court will allow the statement "Shewmaker described me as someone who handles situations through conversation, and he never felt threated in my presence" as a statement within the subject matter of Shewmaker's role as Nickson's immediate supervisor. Shewmaker was also Novak's immediate supervisor, (Nickson Dep. 28:7-12, ECF No. 36-3[1]), so the Court will also allow the description of Novak as a "hothead" in paragraph 2.a to remain in the record. The Court will not strike paragraph 2.a.

---

[1] Excerpts of Nickson's deposition were submitted by both parties. The Court will identify the ECF number for the docket entry that contains the pages cited each time the deposition is referenced.

U.S. Steel is also concerned that Shewmaker's statements are being submitted to prove that, on the occasion of the altercation, Nickson and Novak acted in accordance with their characters as described in the statements. Character evidence is not permitted to be used in such a manner under Federal Rule of Evidence 404(a)(1). In the Court's analysis below, it will not use this evidence in contravention of Rule 404.

U.S. Steel also contends that paragraph 2.b contains hearsay and is irrelevant. The relevancy objection is overruled due to Nickson's § 1981 claim regarding his 2018 termination. However, the statements by Mark Langbehn will not be permitted to be used for the truth of the matter asserted in those statements.

U.S. Steel argues that paragraph 4 is speculative and irrelevant. The statement at issue is Nickson stating that the conveyor chain was not moving and that the area of the plant was not in operation, making it highly unlikely the chain would start. Nickson contends that his observation combined with his years of experience working at U.S. Steel qualify him to offer the opinion that it was highly unlikely for the chain to start. The Court agrees with Nickson. His tenure at U.S. Steel gave him the opportunity to observe under what circumstances conveyor chains begin moving and to provide his opinion here regarding the likelihood under the circumstances.

The relevancy argument is based on the purported "zero-tolerance" policy of the LCA. That is, U.S. Steel argues, whether there was any danger posed by the safety violation is irrelevant to the question of whether a safety violation was committed and the LCA violated. As Nickson identifies, violations of LCA terms do not always lead to termination, so the Court finds this information to be relevant and will not strike paragraph 4.

Paragraph 8 relates to Second Step Minutes that the Court found to not be established as business records above. The statements from those minutes in paragraph 8 are hearsay, and the Court strikes them.

Accordingly, the Court will grant in part and deny in part U.S. Steel's motion to strike.

## MOTION FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying the evidence, if any, which it believes demonstrates the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party supports its motion for summary judgment with affidavits or other materials, it thereby shifts to the non-moving party the burden of showing that an issue of material fact exists. *Keri v. Bd. of Trust. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006).

Rule 56(e) specifies that once a properly supported motion for summary judgment is made, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *Keri*, 458 F.3d at 628.  A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986).

## B. Material Facts

Nickson is a Black male and began working at U.S. Steel on April 8, 1996. (Nickson Dep. 5:17-18, 25:8-9, ECF No. 36-3). During his employment, he received various policies, including policies on illegal or unethical conduct, prevention of workplace violence, and sexual and discriminatory harassment. *Id.* at 32:14-33:5.

### *U.S. Steel's Policies*

U.S. Steel's Prevention of Workplace Violence Policy mandated that "[a]ny employee who commits an act of workplace violence is subject to disciplinary action, up to and including termination of employment" and required any employee "who believes that he . . . has been subjected to . . . acts of workplace violence . . . [to] promptly report such acts to his . . . direct supervisor, Corporate Security, Human Resources, and/or the Law Department." (McElfresh Aff. ¶ 2, ECF No. 36-6). There is a duty and expectation that it be reported if there is an aggressor and another worker who is not wanting to get involved in a fight. (Downs Dep. 14:17-23, ECF No. 36-4). Nickson was aware he had the right to work in an environment "free from violence." (Nickson Dep. 33:24-34:3, ECF No. 36-3).

Another policy "absolutely prohibited" discriminatory harassment. (McElfresh Aff. ¶ 3; Nickson Dep. 34:4-8, ECF No. 36-3). U.S. Steel had a zero tolerance for discriminatory harassment in any form. (Nickson Dep. 34:9-11, ECF No. 36-3).

U.S. Steel policies required Nickson to immediately report any suspected illegal or unethical conduct or "suspected behavior." *Id.* at 33:20-23, 24:12-14. There were multiple ways to report violations, and each involved making reports to U.S. Steel Management. *Id.* at 34:15-21. None of U.S. Steel's policies instructed or allowed employees to report violations to union representatives as a means of fulfilling their reporting obligations. *Id.* at 35:3-5. Making a report to a union representative does not satisfy or extinguish the employee's duty to make a report to U.S. Steel Management. (Downs Dep. 17:23-25, 97:13-16). U.S. Steel's Labor Relations Department is responsible for the investigation of discrimination and harassment claims it receives from the Union. (McElfresh Aff. ¶ 4).

*Nickson's Employment*

Nickson worked at U.S. Steel's Gary Work's location as a Truck Driver in the Transportation Department. (Nickson Dep. 27:9-18, ECF No. 36-3). Henry Kevin Solomon was the Area Manager of Maintenance and Nickson worked in his department. (Solomon Aff. ¶¶ 2-3, ECF No. 36-8). Marc Shewmaker, who served as Transportation Manager, was Nickson's immediate supervisor. *Id.* Matt Novak also worked in transportation beginning in late 2016. (Nickson Dep. 28:13-16, ECF No. 36-3).

Nickson's supervisors did not have authority to unilaterally discipline him or terminate his employment. (McElfresh Aff. ¶ 11). Instead, the ultimate decisions for discipline and termination were recommended by Labor Relations Representatives and approved by McElfresh, in his capacity as Manager of U.S. Steel's Labor Relations Department. *Id.*

On September 25, 2017, Nickson received a 5-day suspension for a September 20, 2017 violation of a safe job procedure for walking across and stepping on a moving chain without engaging the safety switch. *Id.* at ¶ 13. The violation of a safe job procedure discipline was removed after one year, on October 17, 2018. (Pl.'s Ex. I, ECF No. 37-1).

*Nickson and Novak*

Nickson and Novak worked in the same department beginning in 2016 but never worked together and did not get along. (Nickson Dep. 28:15-21, ECF No. 36-3). Nickson tried to ignore Novak. *Id.* 28:23-24. Nickson didn't want to be associated with Novak due to how Novak conducted himself. *Id.* 30:20-25. Nickson considered Novak to be narcissistic. *Id.* 32:1-3. Nickson claimed that Novak regularly gave him the middle finger. *Id.* 93:11-13. Nickson never reported this conduct to U.S. Steel management. *Id.* 93:24-94:2.

In October, 2017, Nickson reported to Shewmaker that Novak put a baseball-sized campaign sticker, which read "Novak for Griever," on Nickson's locker. *Id.* 47:6-48:1, 49:2-15. A very offensive racial slur was written on the bottom of the sticker in black permanent marker. *Id.* 49:17-20. Access to Nickson's locker is not restricted, and he does not know when the slur was written on the sticker. (Nickson Dep. 50:1-7, 51:5-11, ECF No. 37-1). Nickson recognized the handwriting as Novak's. (Nickson Dep. 51:12-17, ECF No. 36-3). Nickson was unable to tell Shewmaker about the racial slur because Shewmaker rushed Nickson off of the phone when he was reporting the sticker, saying "I know, I know, I know." *Id.* 48:3-6. Nickson testified that the relationship between the Novak and Shewmaker was "[a]lmost like they were buddies," (Nickson Dep. 58:25, ECF No. 37-1). Nickson did not report the racial slur to Shewmaker at the time because he "didn't want to cause a big stink at work." (Nickson Dep. 53:2-6, ECF No. 37-1). Nickson eventually reported the use of the slur in or after December 2018. *Id.* 57:2-17. This is the

only instance during Nickson's employment at U.S. Steel that this racial slur has come up. *Id.* 53:16-19.

On November 15, 2018, Novak approached Nickson in the lunchroom, invaded Nickson's personal space, and stated that Novak was displeased with Nickson's comments at a union meeting. Novak called Nickson a vulgar term that is not racially charged. (Pl.'s Ex. H, at 1, ECF No. 37-1). Other employees in the area physically restrained Novak, and Nickson walked away. *Id.*

<u>*Nickson and Novak's Physical Altercation*</u>

On October 31, 2018, Nickson was involved in a fight with Novak. *Id.* 26:7-11. Neither immediately reported the fight, which was unwitnessed, to U.S. Steel. (Downs Dep. 13:24-25, ECF No. 36-4; McElfresh Aff. ¶ 14). Nickson reported the attack to Union President Mr. Lash and Grievance Committee Chair Mr. Popplewell. (Nickson Decl. ¶ 3). The union told Nickson not to tell management. (Nickson Dep. 91:18-20, ECF No. 37-1).

Nickson states that the fight occurred as follows. Novak approached Nickson, and they exchanged words. (Nickson Dep. 86:18-87:11, ECF No. 37-1). Nickson was attacked by Novak, was knocked to the ground, and reacted by defending himself. *Id.* 87:17-88:5. Earlier that day, Novak had given Nickson the finger and said, "F you" *Id.* 93:5:17.

U.S. Steel learned of the fight roughly a month after it occurred, when Novak informed Shewmaker on November 29, 2018. (Downs Dep. 11:22-12:1, 14:4-10; McElfresh Aff. ¶ 14). Shewmaker then contacted Labor Relations. (McElfresh Aff. ¶ 16). Novak had initially claimed that he sustained a leg injury on October 31 while bending over to pick up a piece of angle iron. *Id.* ¶ 14.

Sam Downs served as a Labor Relations Representative for the United Steel Workers Union, Local 1066, of which Nickson was a member. *Id.* ¶ 10. Downs investigated the October 31 fight and interviewed Novak and Nickson. (Downs Dep. 21:11-24). There were no witnesses or video evidence. (McElfresh Aff. ¶ 17). The description of the events by Nickson and Novak were inconsistent with each other, but the investigation concluded that both workers violated U.S. Steel's policy and conduct standards. (Nickson Dep. 85:24-86:3; Downs Dep. 13:15-25, 16:9-11, 17:6-7; McElfresh Aff. ¶ 17). Downs indicated at his deposition that, if one person takes no actions of engaging in a fight, such a hypothetical non-aggressor would likely not be disciplined. (Downs Dep. 41:6-9).

Downs wrote the discipline letters after the fight. (Downs Dep. 11:18-21). On December 4, 2018, Novak received three 5-day suspensions subject to discharge for "physical altercation," "failure to report an incident," and "providing false information." (McElfresh Aff. ¶ 18). On the same date, Nickson received two 5-day suspensions subject to discharge for "physical altercation" and "failure to report an incident." *Id.* McElfresh reviewed and approved the discipline issued to both Novak and Nickson. *Id.* ¶ 20.

Prior to Novak's November 29 report, Nickson did not report to Management that he had been involved in a fight. *Id.* ¶ 15. His failure was a violation of U.S. Steel's Prevention of Workplace Violence Policy. *Id.* During Nickson's grievance process, he stated that he was "scared" to report what had occurred. *Id.* Nickson admitted that Novak did not say anything racially offensive to him. (Nickson Dep. 87:19-25, ECF No. 36-3).

After the discipline was issued and during a December 27, 2018 Second Step Meeting, Nickson reported "childish behavior" toward him from Novak. (Downs Dep. Ex. 3, at 3, ECF No.

36-4). This was the first time Downs or Labor Relations heard of any issue between Novak and Nickson which purportedly occurred prior to the October 31 fight. (McElfresh Aff. ¶ 37).

A "9b" fact-finding meeting was held. (Pl.'s Ex. E). One of the issues for the 9b meeting was who initiated or instigated the altercation between Nickson and Novak. *Id.* U.S. Steel investigator Ken Croft said Nickson's description is believable and consistent with the circumstances. Shewmaker said Nickson had reported harassment by Novak, but Shewmaker did not take immediate action on Nickson's complaint. *Id.* Downs and McElfresh made the decision to discharge Nickson after the 9b hearing. (Pl.'s Ex. M at #7, ECF No. 37-2). U.S. Steel ultimately decided it was not necessary to determine who began the altercation. (Pl.'s Ex. N at #23, ECF No. 37-2).

<u>First Termination and Last Chance Agreement</u>

Both Novak's and Nickson's disciplines were converted to discharge/termination on December 10, 2018. (McElfresh Aff. ¶ 18). McElfresh approved of the decisions to terminate them. *Id.* ¶ 20. Both Novak and Nickson grieved their discipline and termination under their Collective Bargaining Agreements. *Id.* ¶ 21. After negotiations with Union representatives, McElfresh agreed to allow both Novak and Nickson to be reinstated, provided they agreed to, and signed, Last Chance Agreements (LCAs). *Id.* Nickson's LCA was signed on April 25, 2019. (McElfresh Aff. Ex. A, at 2, ECF No. 36-6). It removed Nickson's termination, and each discipline stemming from the October 31 fight was affirmed at a 141-day suspension. *Id.* at 1.

Nickson's LCA was for a three-year duration and contained a Work Conduct provision which read: ". . . any violation of Company rules or policies shall be considered a material violation of this agreement and will result in suspension subject to discharge." *Id.* The LCA also had a Safety provision which read:

14

> "Employee will conduct himself in a responsible and safe manner while on Company property. Any unsafe behavior, safety violation, violation of a safe job procedure, or any violation of a safe operating procedure, etc., will be considered a material violation of this agreement and result in a suspension subject to discharge."

*Id.* Nickson understood that if he committed a safety violation, unsafe behavior, violation of a safe job procedure, or violation of a safe operating procedure, he would be subject to discharge. (Nickson Dep. 85:9-16, ECF No. 36-3). Novak's LCA, signed in April, 2019, contained the same Work Conduct and Safety provisions as Nickson's LCA detailed above. (McElfresh Aff. Ex. B at 1, ECF No. 36-6).

<u>Second Termination</u>

On June 16, 2019, while working under the terms and conditions of the LCA, Nickson committed a safety violation. (McElfresh Aff. ¶ 25). Specifically, Nickson parked his truck and walked over to another area. *Id.* He properly crossed a conveyor chain by engaging a switch which locked out the chain. *Id.* However, on his return trip, he crossed the chain without engaging the switch and without locking it out. *Id.* Even though the chain was not moving either time he crossed it, the chain was considered "live" and could have started moving when he crossed it. *Id.* U.S. Steel states that it is important to engage the safety switch even for a non-moving chain because a person may lose his balance and sustain injury if the chain begins to move while crossing it. (Abernathy Dep. 14:16-15:2, ECF No. 36-5). Nickson counters that it is highly unlikely that the chain would have started moving when Nickson crossed it because that area was not in operation at the time and there were no employees present to start it. (Nickson Decl. ¶ 4).

Darin Abernathy was in a management or process manager position with U.S. Steel. (Abernathy Dep. 6:17-23). He reported to Robert Chorzempa, the Area Manager in the Gary-Finishing Operations-Shipping, Slab Movement & Material Management-HSM Services. (Chorzempa Aff. ¶ 3, ECF No. 36-7). Part of Abernathy's job responsibilities included tracking

15

down the location of steel coils by reviewing video or by other methods on a routine basis. *Id.* ¶ 3. In June 2019, Chorzempa asked Abernathy to locate a coil, which Abernathy did by reviewing video footage. *Id.*

Abernathy states that, during his review, he observed an employee, who he could not identify, cross a conveyor chain in violation of safety protocols. (Abernathy Dep. 9:16-18, 11:11-15, 13:23-24). Abernathy reported the safety violation to Solomon, asking that employees be recontacted about using the proper safety procedures when working in areas that are not their general work area. *Id.* at 14:2-6-10. Solomon reviewed the video and determined that it was Nickson who committed the safety violation, and based on the violation, Solomon requested that Labor Relations initiate discipline for Nickson. (Solomon Aff. ¶ 6). Solomon affirms that he did not consider Nickson's race when he contacted Labor Relations. *Id.* ¶ 7. Solomon has contacted Labor Relations to initiate discipline for non-Black employees who committed safety violations. *Id.* ¶ 8.

Nickson contends that, on or about June 17, 2019, U.S. Steel employee Stephan McNulty was in Abernathy's office. (Am. McNulty Stmt., ECF No. 37-1). Abernathy was reviewing the video that showed Nickson crossing the conveyor chain, which was not moving or carrying coils. *Id.* Abernathy said Shewmaker asked him to review the video. *Id.* McNulty heard Abernathy say "now we got him" when he saw Nickson cross the chain. *Id.* Nickson acknowledges that he committed a safety infraction on June 16, 2019, and violated the safety provision of his LCA. (Nickson Dep. 82:23-83:3, ECF No. 36-3).  Nickson considers it retaliatory that Abernathy reported the safety violation directly to Solomon instead of Abernathy's manager. (Nickson Dep. 76:5-13, ECF No. 36-3).

16

Solomon did not have the authority to unilaterally discipline or terminate Nickson's employment. (Solomon Aff. ¶ 6). Instead, the final decision on discipline and termination was made and approved by U.S. Steel's Labor Relations Department. *Id.*

On June 21, 2019, Nickson was issued two 5-day suspensions subject to discharge: the first for committing an unsafe act and the second for violation of his LCA. (McElfresh Aff. ¶ 26). During a "fact-finding" hearing on June 25, 2019, Nickson admitted that he crossed the chain in violation of U.S. Steel's procedures. *Id.* Nickson stated the reason he failed to lock out the chain on his way back to his truck was because he was distracted thinking about a tire on his truck, which he noticed might have been bad. *Id.* He later stated he was distracted when he saw a crane drop a coil on his truck. *Id.* Nickson stated at his deposition that a crane slammed the coil down on his truck, and on impact the right side of the truck went down. (Nickson Dep. 98:10-15).

On June 27, 2019, Nickson's suspensions were converted to discharge, and Nickson was terminated from U.S. Steel for a second time. (McElfresh Aff. ¶ 27). Nickson, through his Union representatives, pursued a grievance of his June 2019 discharge. *Id.* ¶ 28. McElfresh declares that Nickson's race was not considered, and was not a factor, in the decision to issue discipline or convert his discipline to discharge in either 2018 or 2019. *Id.* ¶ 29.

### *Safety Violations and LCAs*

Nickson believes that he should have been issued a "safety conversation" instead of being discharged when he crossed the chain without locking out in June 2019. (Nickson Dep. 95:23-96:2, ECF No. 36-3). It is "relatively frequent" that an employee forgets to lock out a chain before crossing it. (Abernathy Dep. 15:3-9, ECF No. 37-1).

At least ten white Local 1066 employees were disciplined by Labor Relations for violating "lock out, tag out" procedures similar to the procedure violated by Nickson on June 16, 2019. *Id.*

¶ 30. At least three other Local 1066 employees, who are Black, Hispanic, and white, received discipline for violating their LCAs. *Id.* ¶ 31. At least sixteen other Local 1066 employees, some Black and some white, were terminated for violating their LCAs. *Id.* ¶ 32. There have been many Black, Hispanic, and white Local 1066 employees who have successfully completed the terms of their LCAs. *Id.* ¶ 33.

*Acrimony Between Nickson and Solomon*

As described by Nickson, on August 1, 2017, Nickson received a written warning for failure to perform a vehicle inspection. *Id.* at ¶ 12. Shewmaker did not want to issue the discipline but was made to issue it by Solomon, his boss. (Nickson Dep. 59:23-60-1, ECF No. 37-1). Shewmaker did not believe the discipline was justified. *Id.* at 78:11-12.

Another event occurred in 2017 or 2018. U.S. Steel's version is that, in 2017, Solomon observed Nickson, along with a white employee, sitting in their parked trucks, in the "Tarp Shed," an area where they should not have been. (Solomon Aff. ¶ 4). Solomon's impression was that the two employees were parked in an effort to avoid transporting additional coils near the end of their shifts. *Id.* Nickson argued with Solomon when Solomon approached them and shared his observations. *Id.* Solomon instructed both to leave and advised them that he would call Security if they failed to leave as instructed. *Id.* Both employees "clocked out" about 30-45 minutes prior to when their shifts were supposed to end. *Id.* Solomon's interaction with Nickson was not based on his race, nor did his race play a role in instructing him to leave prior to the end of his shift. *Id.*

Nickson's version is that, in August 2018, he and coworker Gary Bullington were doing post-trip inspections. (Nickson Dep. 41:25-42:4, 42:21-22, ECF No. 37-1). Nickson explained that he was doing his post-trip inspection to Solomon, who was irate. (Nickson Dep. 41:22-43:7, ECF No. 37-1). Nickson's coworker was sent home only after Nickson asked Solomon why the

18

coworker was not being sent home too. *Id.* at 42:15-20. Solomon, through his actions, body language, and tone, talked to Nickson like Solomon was the "slave master." *Id.* at 43:1-45:6. Nickson reported Solomon to the Civil Rights Committee Chair; after that, Solomon apologized to the Union for the language he used. (Nickson Decl. ¶ 7, ECF No. 37-1; Nickson Dep. 43:19-44:2, ECF No. 37-1).

After reinstatement, Nickson overheard Shewmaker and Solomon talk negatively about Nickson, saying "I can't believe he is back. This is a big mess." (Nickson Dep. 38: 11-17, 39:23-40:3, ECF No. 37-1). Nickson spoke with Solomon, who said everything was Nickson's fault in reference to the conflict between Nickson and Novak and, if it were up to Solomon, that Nickson would not have a job. *Id.* 39:5-13. Solomon stated that he did not want any "BS" and that Novak liked it where he was in the tractor shop changing tires. *Id.* 39:13-15.

<u>*Equal Employment Opportunity Commission Charges*</u>

Nickson filed EEOC Charge #24E-2019-0036 against U.S. Steel on December 12, 2018, alleging race discrimination from November 1, 2017, through December 10, 2018. (Pl's Ex. H at 1-2, ECF No. 37-1). He amended the charge on February 7, 2019, and alleged racial discrimination. *Id.* at 3. His allegations related to the physical altercation with Novak. *Id.* Nickson's Dismissal and Notice of Rights from this Charge is dated May 23, 2019. *Id.* at 4. He did not file a lawsuit as a result of receiving this letter. (Nickson Dep. 81:14-19, ECF No. 36-3).

Nickson filed EEOC Charge number 470-2020-00460 on November 12, 2019, alleging race discrimination and retaliation from June 21, 2019, through June 26, 2019. (Pl.'s Ex. P at 1, ECF No. 37-2). Nickson alleges that he was terminated due to a safety infraction that other, white employees were not terminated for violating. *Id.* He believes that his termination was due to his race and in retaliation for engaging in protected activities. *Id.* at 1-2. The Dismissal and Notice of

Rights from his second Charge was dated November 19, 2019. *Id.* at 3. Nickson filed the instant cause of action on December 23, 2019.

### *Other U.S. Steel Employees*

Nickson believes two white employees, Don Ferris and Kevin Banashak, were issued safety conversations instead of formal discipline as a result of crossing a conveyor chain without locking out. (Nickson Dep. 70:12-22). Labor Relations does not have any record of Don Farris having improperly crossed a chain. (McElfresh Aff. ¶ 38).

On or about March 6, 2020, Kevin Banashak was issued a 5-day suspension subject to discharge for a safety violation when he crossed a conveyor chain. *Id.* ¶ 39; (Pl.'s Ex. M ¶ 9, ECF No. 37-2). He was not working pursuant to an LCA at the time. (McElfresh Aff. ¶ 39). Nickson believes, however, that Banashak committed this safety violation another time, for which he was not disciplined. This other violation occurred on or about September 9, 2019, when Banashak crossed a loaded conveyor chain without locking out. (Porter Decl. ¶ 2, ECF No. 37-1). U.S. Steel employee Patricia Porter observed the incident and reported it to Area Manager Robert Chorzempa, who said he would look into it. *Id.* ¶¶ 1, 3. No discipline was processed by U.S. Steel's Labor Relations Department to Banashak on or about September 9, 2019. (Pl.'s Ex. M ¶ 9). Chorzempa, for his part, declares that he was never informed by Patricia Porter that Banashak crossed a chain without engaging the safety switch. (Chorzempa Aff. ¶¶ 2, 4).

### C. Analysis

### *Race Discrimination Under § 1981 for 2018 Termination*

U.S. Steel contends that Nickson cannot show elements of the *McDonnel-Douglas Corp. v. Green* method of proof. *See* 411 U.S. 792 (1973). However, Nickson rightly identifies that

*McDonnel-Douglas* is merely one way to show that discrimination occurred.[2] The ultimate standard he must meet is whether the evidence as a whole "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). A litigant bringing a claim of discrimination based on race in violation of 42 U.S.C. § 1981 must prove that race was the but-for cause of the alleged discrimination. *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S.Ct. 1009, 1014 (2020).

Unless there is a direct admission of discriminatory intent, evidence of discrimination typically includes "(1) suspicious timing, ambiguous oral or written statements, or behavior toward, or comments directed at, other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; or (3) evidence that the employer offered a pretextual reason for an adverse employment action." *Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 805 (7th Cir. 2014).

Nickson contends that the following evidence (viewed in the light most favorable to him) supports his claim of racial discrimination regarding his 2018 termination. On October 31, 2018, Novak, who is white, attacked Nickson for no justifiable reason, and Nickson defended himself against the attack. U.S. Steel's investigator Croft said Nickson's version of the altercation was consistent and believable. Novak had previously used a very offensive racial slur against Nickson by writing it on a sticker Novak placed on Nickson's locker. In Nickson's view, Novak and

---

[2] Nickson does, later in his response, argue that he can meet *McDonnel-Douglas*'s prima facie case for this claim even though he does not need to. However, Nickson is unable to show that a similarly situated employee not in Nickson's protected class was treated *more favorably*. The only employee Nickson identifies is Novak, who received *the same* discipline as Nickson. To the extent Nickson argues Novak, as aggressor, should have received a more stringent punishment, this only establishes that Novak is not similarly situated.

Nickson inequitably received the same discipline for the physical altercation even though they were not equally culpable for the workplace violence.

Nickson contends that Downs's deposition testimony indicates that, under Nickson's version of the circumstances of Nickson's and Novak's altercation, Nickson as non-aggressor should not have been disciplined. However, Downs's testimony is that if a non-aggressor made *no* actions of engaging in the fight, then the non-aggressor would not be disciplined. Those circumstances to not match the evidence here, even when it is viewed in the light most favorable to Nickson. Nickson engaged in the fight by responding in defense when he was attacked, acknowledging that there was a "physical exchange." (Resp. at 16, ECF No. 37).

U.S. Steel's Prevention of Workplace Violence Policy mandated that "[a]ny employee who commits an act of workplace violence is subject to disciplinary action, up to and including termination of employment." (McElfresh Aff. ¶ 2). The policy also requires employees to promptly report when they believe they have been subjected to an act of workplace violence. They may report to direct supervisors, corporate security, human resources, or the law department.

Nickson presents evidence that he reported the altercation to his union and that the union advised him to not report the incident to U.S. Steel. The Court assumes this to be true, but this does not alter the fact that Nickson, acting on *union* advice, did not comply with *U.S. Steel's* requirement as stated in the Prevention of Workplace Violence Policy to promptly report the matter.

Novak received three 5-day suspensions subject to discharge for physical altercation, failure to report an incident, and providing false information. Nickson received two 5-day suspensions subject to discharge for physical altercation and failure to report an incident. Novak's

and Nickson's disciplines were converted to discharge. After grieving their disciplines, both Nickson and Novak were reinstated subject to Last Chance Agreements.

The mere fact that Novak and Nickson are different races is not enough to convince a reasonable juror that Nickson's race was the but-for cause of his termination. That Novak had used a racial slur against Nickson is also insufficient; Novak was not tasked with deciding whether to terminate Nickson's employment. Nickson engaged in workplace violence, and Nickson failed to promptly report the incident, two matters which violate U.S. Steel policies and for which Novak, who is white, received the same punishment as Nickson. Nickson has not presented evidence from which a reasonable jury could conclude that a white employee who physically defended against an attack and failed to report the attack would not have been fired under U.S. Steel's workplace violence policy. Summary judgment must be entered in U.S. Steel's favor on this claim.

### _Race Discrimination Under § 1981 and Title VII for 2019 Termination_

Again, Nickson states that he is not proceeding under the _McDonnel-Douglas_ framework for withstanding summary judgment on this claim.[3] Nickson argues, citing _Ortiz_, that a reasonable juror could conclude that Nickson would have kept his job if he had a different ethnicity and everything else remained the same.

By the time of his second termination, Nickson had reported that Novak used a very offensive racial slur against him. U.S. Steel knew about the altercation between the two employees, and their investigator found Nickson's version of events believable and consistent. Nickson and Novak were permitted to return to work by signing substantially similar LCAs.

---

[3] In his brief, Nickson does allude to the "now we got him" statement and asserts that it indicates U.S. Steel was looking for Nickson to fail without looking for Novak (who is white) to fail, thereby vaguely arguing that a similarly-situated employee not in Nickson's protected class was treated more favorably. However, Nickson does not present argument or evidence regarding the other challenged element of the _McDonnel-Douglas_ framework for this claim, namely that he was meeting U.S. Steel's legitimate expectations in relation to this second termination.

Nickson crossed a non-moving chain without locking out. This is a safety violation, but one that is committed on a relatively frequent basis. U.S. Steel also appears to not have considered Nickson's distraction by the damage to his truck as a mitigating factor in Nickson's failure to lock out before crossing the chain. When Abernathy saw video of the violation, he said, "now we got him," and reported the violation to Solomon instead of Abernathy's direct supervisor. (Am. McNulty Stmt., ECF No. 37-1). The statement lends credence to the argument that U.S. Steel was looking for a reason to "get" Nickson, but any connection to Nickson's race is unapparent.

The closest Nickson comes to showing any motivation based on race is his identification of Banashak, a white employee. Banashak, who was not working pursuant to an LCA, was reported to his manager for crossing a chain without locking out in September 2019. He did not receive any recorded discipline at all for the violation. In viewing the evidence most favorably to Nickson, Banashak received no discipline and Nickson received very harsh discipline for committing the same safety violation. Though Banashak is white and Nickson is Black, there are too many differences in circumstances (such as the LCA and Nickson having previously crossed a chain without locking out) between the two and not enough evidence of U.S. Steel considering race for a reasonable juror to conclude that Nickson would still have his job if he were a different ethnicity. That is, even if there is evidence of pretext here, there is insufficient evidence from which a reasonable juror could find that it is pretext for racial discrimination. *See King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017). The Court grants summary judgment on this claim in U.S. Steel's favor.

<u>Retaliation Under § 1981 and Title VII for 2019 Termination</u>

The methods for proving a retaliation claim are the same under both Title VII and § 1981. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007). Nickson must show that

24

he would not have been fired but for his protected activity. *See Adusumilli v. City of Chi.*, 164 F.3d 353, 363 (7th Cir. 1998). Unlike with his claims of racial discrimination, for his claim of retaliation, Nickson does not reject the use of the burden-shifting framework in his attempt to survive summary judgment.

"To establish a prima facie case of retaliation, a plaintiff must demonstrate: (1) that he engaged in statutorily protected activity; (2) that he suffered an adverse employment action; and (3) that there is a causal link between the two." *Oliver v. Joint Logistics Managers, Inc.*, 893 F.3d 408, 413 (7th Cir. 2018). "When the plaintiff establishes a prima facie case of retaliation, an employer may produce evidence which, if taken as true, would permit the conclusion that it had a legitimate non-discriminatory reason for taking the adverse employment action." *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020). "If the employer meets this burden, the plaintiff, to avoid summary judgment, then must produce evidence that would permit a trier of fact to establish, by a preponderance of the evidence, that the legitimate reasons offered by the employer were not its true reasons but were a pretext for discrimination." *Id.*

U.S. Steel acknowledges that Nickson's first EEOC charge is a protected activity. There is no doubt that the termination of Nickson's employment was an adverse employment action. However, U.S. Steel argues that the six months that passed between the filing of the charge and Nickson's dismissal do not permit any inference of a causal link.

Nickson counters with evidence that, when Abernathy, who held a management position with U.S. Steel, saw Nickson cross the chain without locking out, Abernathy said "now we got him." (Am. McNulty Stmt., ECF No. 37-1). Further, though over six months passed between Nickson's EEOC charge and the second termination of his employment, Nickson had only returned

to work according to the Last Chance Agreement on April 25, 2019, approximately two months prior to his second termination on June 27, 2019.

Though, perhaps, neither the statement nor the two months would alone permit an inference of a causal link between Nickson's EEOC complaint and his termination, they do in combination. The statement lends credence to the argument that U.S. Steel was looking for a reason to once again terminate Nickson's employment. The termination came approximately two months after he resumed working for U.S. Steel after filing his EEOC complaint. Though the complaint had been filed approximately six months prior to Nickson's 2019 termination, U.S. Steel would not have been looking for reasons to terminate Nickson's employment when he was not working for the company.  There is just enough here to permit an inference that U.S. Steel was biding its time, looking for an opportunity to punish Nickson for filing his EEOC complaint. *See Lalvani v. Cook Cnty., Ill.*, 269 F.3d 785, 791 (7th Cir. 2001).

With a prima facie case made, the burden shifts to U.S. Steel to state a legitimate, nondiscriminatory reason for the discharge. U.S. Steel points to the safety violation and the Last Chance Agreement.

It lastly comes back to Nickson to show pretext. Again, there is the "now we got him" statement and the temporal proximity to Nickson's return to work at U.S. Steel, which permits the inference that U.S. Steel was actively looking for an excuse on which to base Nickson's termination. However, Nickson ultimately must show that he would not have been fired *but for* his EEOC complaint. Nickson presents evidence that the safety violation of crossing a conveyor chain without locking out is committed relatively frequently, and Abernathy reported the violation to Solomon instead of Abernathy's direct supervisor. The evidence reveals an acrimonious relationship between Solomon and Nickson.

The evidence resolved in Nickson's favor shows that one employee, Banashak, whose violation (while not working pursuant to an LCA and without a history of committing this violation) was reported to his manager, did not receive any recorded discipline at all for the violation, which suggests that termination for such a seemingly minor infraction is an outsized reaction. Further, it appears that U.S. Steel did not consider Nickson being distracted by his truck being damaged as a mitigating factor in determining to what extent to discipline Nickson. Nickson has produced enough evidence from which a reasonable jury could conclude that but-for Nickson's EEOC complaint, he would not have been terminated. Thus, he withstands the motion for summary judgment on this claim.[4]

### *Hostile Work Environment*

The elements of a plaintiff's claim for discrimination on the basis of a hostile work environment are "(1) they were subject to unwelcome harassment; (2) the harassment was based on their race; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018) (citing *Alamo v. Bliss*, 864 F.3d 541, 549 (7th Cir. 2017)). "Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of

---

[4] The Court is aware that the evidence for the retaliation claim and the racial discrimination claim for Nickson's second termination is very similar, and yet the Court reaches different conclusions on summary judgment for these two claims. A couple of matters contributed significantly to this disparity. One is Nickson's use of the burden shifting framework for the retaliation claim but the rejection of it and incomplete argument for it for the racial discrimination claim. Another is the temporal proximity of Nickson's return to work after his EEOC complaint and his firing.

   The "now we got him" statement allows the inference that U.S. Steel was looking for an excuse to terminate Nickson. The temporal proximity to Nickson's return to work after his EEOC complaint is enough for a reasonable factfinder to conclude that the real reason U.S. Steel wished to terminate Nickson was due to his protected activity. There is no analogous evidence from which a reasonable factfinder could conclude that the real reason was Nickson's race. Though Nickson has identified Banashak's lack of discipline for crossing the chain, and the disparity in discipline is enough to indicate that perhaps Nickson's termination was an outsized reaction by U.S. Steel, there are two many differences between Banashak and Nickson to conclude that the difference in discipline was due to race.

employment." *Passananti v. Cook Cty.*, 689 F.3d 655, 667 (7th Cir. 2012). "[A]n unambiguously racial epithet falls on the 'more severe' end of the spectrum." *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002). "[A] supervisor's use of [a racial slur] impacts the work environment far more severely than use by co-equals." *Gates v. Bd. of Educ. of the City of Chi.*, 916 F.3d 631, 639 (7th Cir. 2019).

Here, Nickson contends that he was subjected to a hostile work environment. The evidence he cites in support is that, in October 2017, Novak wrote an extremely offensive racial slur on a sticker that he placed on Nickson's locker. Nickson argues that when he attempted to report the incident to his supervisor, Shewmaker did not want to hear about it. However, the evidence shows that Nickson only reported that Novak had placed the campaign sticker on Nickson's locker and that the use of the racial slur was not reported. Nickson argues that the buddy-like relationship between Shewmaker and Novak enhanced the racial hostility of Nickson's work environment. Nickson eventually reported the use of the racial slur in or after December 2018.

Nickson also points to the November 2018 lunchroom incident where Novak invaded Nickson's personal space and was restrained by other employees in the area. This incident did not include explicit references to race, and Nickson's account of the event ties Novak's displeasure to Nickson's statements at a union meeting.

When the harasser is a coworker and not a supervisor, "the employer is liable only when the employee shows that [their] employer has been negligent either in discovering or remedying the harassment." *Paschall v. Tube Processing Corp*., 28 F.4th 805, 813 (7th Cir. 2022) (alterations from original omitted). The employer has met its duty if it takes reasonable steps to discover and rectify discriminatory harassment. *Id.* "An employer cannot be expected to remedy harassment unless the employee informs the employer about the situation." *Glemser v. Sugar Creek Realty,*

*LLC*, 970 F. Supp. 2d 866, 873 (C.D. Ill. 2013) (citing *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1038 (7th Cir. 1998)). Nickson acknowledged in his deposition that U.S. Steel had a policy that absolutely prohibited discriminatory harassment of its employees and provided multiple ways to report perceived violations of the policy.

From the evidence presented, no reasonable juror could find that all of the elements of a hostile work environment are met. The basis for employer liability is questionable. Nickson initially reported to his supervisor only that a campaign sticker was placed on his locker. Nickson did not connect the placement of the sticker on his locker to discrimination against Nickson based on his race. Even accepting Nickson's argument that Shewmaker failed to follow up on Nickson's complaint about the sticker, there was nothing in Nickson's complaint to signify to Shewmaker (and, by extension, to U.S. Steel), that the placement of the sticker was racially motivated. Regarding this initial report by Nickson, U.S. Steel had no notice of the racial slur used against Nickson and was not aware that Nickson was subject to any unwelcome harassment due to his race. The relationship between Shewmaker and Novak does not alter the facts that the slur was not reported to U.S. Steel and that there were multiple avenues by which Nickson could report the incident.

Though Nickson did, over one year later report the incident, this in turn undermines the requirement that the harassment be so severe or pervasive to alter the terms and conditions of employment. Though the racial slur used was incredibly offensive, it was used a single time by a coworker. It was written instead of being used in a verbal manner accompanied by threatening or intimidating body language. Nickson himself did not feel compelled to report the use of the slur until over one year later when his employment was at stake. Immediately after the incident, he did not report the use of the slur because he did not wish to "cause a big stink." (Nickson Dep. 53:2-

6, ECF No. 36-3). The lunchroom incident is evidence of the acrimonious relationship between Nickson and Novak, but it does not do much to indicate a racial basis for the acrimony. Under these circumstances, a reasonable juror could not find that the terms and conditions of Nickson's employment were altered by this incident, so Nickson cannot show that all of the elements of a hostile work environment claim are met.

Summary judgment in favor of U.S. Steel is appropriate on the claim of hostile work environment.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS in part** and **DENIES in part** Plaintiff's Motion to Strike Portions of Defendant's Summary Judgment Evidence [DE 38], **GRANTS in part** and **DENIES in part** Defendant United States Steel Corporation's Motion to Strike Evidence Submitted by Plaintiff in Response to U.S. Steel's Motion for Summary Judgment [DE 41], and **GRANTS in part**  and **DENIES in part** Defendant, United States Steel Corporation's, Motion for Summary Judgment [DE 33]. The Court grants summary judgment on the claims of racial discrimination regarding Nickson's first and second terminations and the hostile work environment claim. The Court denies summary judgment on the claim of retaliation in violation of § 1981 and Title VII.

SO ORDERED on September 28, 2022.

s/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN, JUDGE
UNITED STATES DISTRICT COURT